Thank you, Your Honor. My name is Patty Goldman, and I represent the Petitioner Health and Farmworker Organizations. May it please the Court. In this petition, we are asking the Court to order EPA to take the regulatory actions that are required under statute based on its findings that these pesticides pose unacceptable risks. In this argument, I will address two issues. The first is that EPA has unreasonably delayed taking action because it has found these pesticides pose unacceptable risks, particularly to children, and because the timeline it offers this Court would not take the actions that were sought in our petition and that are required by statute when the agency makes these findings. So can I, I mean, I understand the argument that there's a delay here, and this is a little bit unusual because while, I think since you filed your petition, Congress actually extended the deadlines, right? And not only extended the deadlines, but expanded, if I have it correctly, expanded the scope of what needs to be considered in order to make this determination. Why doesn't that change the analysis? I mean, it seems like that's a pretty big fact that would differentiate this case from some of our prior precedent. Could you address that? Yes. Congress did extend the deadlines for four years, but it didn't change, it didn't expand the scope. It shrunk the scope, but not for reasons relevant to this case. It gave EPA a pass on some of the Endangered Species Act requirements, but not the human  I thought it, I thought it asked for, I must have it wrong, I thought it asked for some additional research to be done, or I thought that was one of the bases, so, okay, okay. So the reason that deadline isn't relevant here is because we filed a petition, first and foremost, under the Federal Food, Drug, and Cosmetic Act, seeking action on findings EPA had already made that these pesticides, organophosphate pesticides, are associated with learning disabilities and behavioral disorders from exposures during pregnancy, and EPA had not acted. Under that statute... And can I just ask about that, because the other interesting aspect to this is, there's, well there were originally 15 pesticides, and now we're down to 12, is that correct? Well, two, EPA addresses two together, so it's 12 or 13, depending on how you count. I see, okay. That's also unusual, because, and the reason I'm asking it is, when you say they've made this finding, is that across the board, or, I would assume that some of these pesticides, there's different levels of harm or risk to the children, or whatever else you're saying, how much does that evidence that you say apply to all 12, or does it just apply to some? Well, the answer is actually both. So EPA did a review of the science on this class of pesticides in 2015, and it found that there is substantial scientific evidence that exposures in pregnancy are linked to autism, attention deficit hyperactivity disorder, and other learning and behavioral impairments. That was for all of the pesticides together, and then EPA issued risk assessments for 11 of the 12 pesticides, and found risks for them that are above EPA's safe level in drinking water, food, spray drift from the fields to places where people live or go to school, and to the workers. And so those were particularized to those 11 pesticides. We filed our petition when EPA had not acted on those findings, so it already found... Because that was, wait, I thought you filed in 2021. Yes, and that was after all of those risk assessments had gone. Right, okay.  And this case is very similar to two that this court has already decided that also concerned organophosphate pesticides. The panic case. Well, the panic case is really interesting because you have a before and after. In 2013, this court denied a writ of mandamus because EPA had not found the pesticide unsafe, and it viewed this pesticide, like all of the other issues in front of this agency. It didn't differentiate because EPA had not made these safety findings. But two years later, the agency... Meaning they had more discretion to just balance whatever agency issues were out there. But once this finding has been made, that needs to be pushed to the top of the list. That's your argument. That's what that was... And that's what the court said. Yeah. The court said once EPA made those findings, and it was unacceptable risks in drinking water and to farm workers, then that tipped the balance, and EPA had to act, and the court ordered... That was in the second case, though. That was in the second case in 2015, and the court ordered EPA to act on the petition, meaning deny it or grant it, in 90 days, and to propose revocation of tolerances on that timeline. So to take the regulatory action that's required. And then to finish that process about a year later. In the Natural Resources Defense Council case, the court also addressed... Let me just push back a little bit, because I think that gets back to what I was asking before, where you have Congress extend... Because the current... I know it doesn't totally control, but it seems like it's relevant. Congress extended the deadline for them to make these tolerance determinations to 2026, correct? Mm-hmm. So it would be a little bit odd. I just took from your argument that what you're asking us to do is basically order them to do this within 90 days, based on the PANA, the second PANA decision. But that doesn't seem to flow exactly from that hiccup where Congress has extended the deadline to 2026. It would be unusual for us to say there was a mandamus violation when the deadline hasn't even expired yet. The registration review deadline is not under the Food Law. It's under the Federal Insecticide... Yeah, yeah, yeah. So you're saying we could still do that. PANA still applies to the first statute, even if Congress has extended the FFRA deadline. And even more so, this court in the LULAC case, which was then reviewing the action that EPA took on chlorpyrifos, an organophosphate pesticide, said that the registration review deadline was not relevant to the timeline EPA must follow in acting on findings that a pesticide is unsafe. It said that there are different issues, and there's a balancing that EPA can do. I understand that it's not controlling, but it does seem to... You didn't have this in the PANA case or the LULAC case, a congressional extension. No, in those cases we had a 2022 deadline, but the court imposed deadlines that were far in advance of that. But here, if you look at now what EPA has proposed, it has proposed a timeline that would make updated risk findings and safety findings mostly in 2026. That is for... Who would extend it to 2027, isn't it? Or not? Well, it's ambiguous on that. So for some, in the table that EPA has provided, it provides the year, 2026, for 11 of the 12 food law decisions and for about half of the worker decisions. And by that, I understand that EPA would update any health risk assessments and safety findings. And it is not, though, imposing any timeline for acting on those findings. But it is saying 2026, so that is in sync with the statutory deadline. For about half of the worker risks, EPA doesn't say 2026. It says it will make those updated findings in conjunction with registration review. Now, one might intuit that would mean 2026, since that is the statutory timeline, but EPA is not saying that. And as Your Honor pointed out, its latest schedule from 2024 has two of the organophosphate pesticides not having decisions or updated findings until 2027. So how many chemicals are the subject of the current petition for rid of mandamus? It's 13 and two of them. One is a byproduct of the other. EPA addresses them together. Okay. And for purposes of standing, I know you have a section on standing in your petition. Do you have someone who's covered each one of those individual chemicals? I would have to look at that. What we have is we have organizations who submitted declarations attesting to the crops on which farm workers work, who are members, or where people live near the fields. And EPA authorizes use of organophosphates on those crops and has found risks of concern from them. I would have to go back and see if we have that correlation for crop groupings for which these pesticides are authorized and where there are risks of concern. Do you think that cumulatively you've covered all 13 in that factual showing? I believe we have covered all of them that are used on vegetables and fruit crops, but I can double check. We have not submitted... All 13 used on vegetables and fruit crops? There's one that is used primarily on cotton, and that has not been something that we have focused on. And so I'd be happy to... So you think you would not have standing as to that one that was used with cotton? We probably would not on that one. Which chemical is that? Tribufos. Excuse me? Tribufos. But I would be happy to provide that correlation for the court if the court would like that. We have a lot of crops that are identified in the declarations. EPA authorizes these pesticides to be used on a lot of crops and has found the risks of concern. So I believe we could make the correlation. I think we provide illustrative examples in our brief. Of all except for the Tribufos? I don't think we provide it all. I think we did illustrative examples, but I would be happy to link that up for the court. I'd like to direct the court to the Natural Resources Defense Council case, which also... Can I... Sorry, before we move on. I mean, so here... This is one of the things I'm trying to grapple with, is how controlling is PANA and LULAC? Because I mean, as this conversation is... I mean, these are different. They are different. I mean, you're trying to kind of group them in and say, yeah, all the research is the same, but there are some differences here. And I'm trying to figure out how much that changes what our prior precedent is, because I mean, you could also imagine... There's nothing to stop you from saying, I mean, there's 800 of these that are... 800 pesticides that are approved at some point, right? I mean, you're challenging or you're asking for a recertification on 12 of them, but what if you came in and asked for all 800 of them? Would you still be in arguing where you have to meet the same deadlines that PANA did and others, even if you asked for a recertification of all 800? I guess I'm just wondering how much of the scope of your petition changes our prior analysis in these other cases. Your Honor, I know of no other pesticides that pose the same types of risk to human health that are languishing in the registration review process, and EPA has pointed to none. It has completed registration review on by far the majority of those 800 pesticides. We're down to a hundred or so now, and a lot of those have more ecological kinds of effects and not the human health ones we're talking about here. And we're not the ones that have made these findings. So to the extent there are differences between one of these pesticides and another, that's for EPA to assess in its risk assessments, which it's done. I totally understand that. I'm just saying, before what we've said is, look, six years is egregious. Six year delay is egregious. But that was a delay on one pesticide. Here you're saying, we got 12 pesticides or 13 pesticides, all of which have a finding of harmfulness, so you've got to do these all within 90 days. And I'm wondering if you can, how much you can apply that. The EPA still, even if there's harm to health that's been found, they still have to have a basis to go through all 12 or 13 of these, because they can be treated differently. So it's a different bucket that we're dealing with than just one pesticide straight up or down. We can focus all of our research on that one. Presumably you could get that done in a tighter timeframe than all 12 of these. And that's what I'm struggling with in this case, because I don't know whether it makes that much difference or not. Well, there is a key difference between this case and the PANA and NRDC cases, which is we didn't file the petition until after EPA had made its risk findings and had not acted on them, and what it has done since. So that was 2021. So it has taken four years now reassessing the science to update those findings, and then it is still finding unsafe exposures. We're asking the court to direct EPA to act on those findings. It has offered a schedule where it would do that. It would update the findings over the next year for most of them. And I'm not sure what they mean in conjunction with registration review, and that might be a question for EPA's counsel. Do they mean 2026, or are they being ambiguous, and might it be some later date? Whenever they make those decisions, what we're asking this court to do is direct EPA to act on them. That's what we saw in the petition. We didn't seek a new safety finding to sit on a shelf. We sought the actions that are compelled. And for the food uses, if EPA cannot find the uses safe, it has to revoke the tolerances for those uses. That is in the food law. In subsection D, in response to a petition, EPA can deny the petition. That is judicially reviewable. Or if it cannot find the pesticides safe, it has to revoke the tolerances. That was the holding in LULAC. That's the plain language of the statute. And we're asking the court to give EPA a deadline. We're looking to the deadlines in the PANA and the NRDC cases because EPA has not offered a deadline. It's silent. It doesn't say anything about how long it will take for it to do the regulatory steps that are statutorily required. In the absence of an EPA proposal, what the court did in those cases is gave EPA 90 days to start the process, a proposed revocation, or starting cancellation in a year to finish it. That's what this court found to be reasonable. If EPA had offered something else, we could respond. I'd like to save the rest of my time for rebuttal. Thank you. May it please the court. Laura Glickman on behalf of EPA. With me at council's table is Devi Chandrasekaran of EPA's Office of General Counsel. I'd like to first respond to petitioner's characterization of EPA risk assessments here. EPA completed an initial round of risk assessments on the majority of these pesticides between 2015 and 2020. EPA identified risks of concern in these initial risk assessments, but made clear that there was a lot of uncertainty in the data, and that it was going to continue to develop additional data that might help to resolve some of that uncertainty, and enable the agency to more precisely evaluate risk. EPA now has that data in hand, and has begun to revise these risk assessments. Petitioners paint the health risks. So wait, are you saying that you might revisit, that you might say there is no health risk, or you're just refining what that health risk might be? EPA has already refined the analyses of several of these pesticides. Its current thinking for two of them is that they pose no risk to human health whatsoever. And its current thinking is encapsulated in proposed interim decisions for malathion and dimethylate. But the other 10, do I have it correct, or the other 11? We consider it to be 11. Okay, so the other 11, you agree that there is a risk to human health? We do not. So EPA has made it... Hold on. The other 11, you've made a finding at some point since 2015 of risk to human health, but you might be revising it. We disagree that this is, that identifying human health, potential human health risks in those initial health assessments constitute findings. They're not final agency actions. And in fact, the agency was clear in the assessments that they were not final, and that it was going to continue to revise those analyses. And EPA is working on that now. As I mentioned, there are two where EPA's current thinking is that they do not pose any health risks. There is another one for which there is a proposed interim decision where EPA's current thinking is that it does pose human health risks. The science... And what is EPA? Which chemical is that? That's acephate. And what's the timeline for further action on that? So I believe... I believe acephate has a, I'm not 100% sure. It's in the schedule for our brief, but I believe that has a 2026 response date. So EPA is currently working with registrants to take additional action there. The science... So they asked, they raised a question about what these 2026 deadlines mean. Is that saying you're going to determine that it does have a risk by 2026, but you're not necessarily going to revoke the tolerance levels? So it might be helpful just to take a step back and discuss the differences between these two statutes. So under the FFDCA, the sole question for EPA is whether the tolerance is safe. In response to an administrative petition like this one, if it determines that the tolerance is not safe, it must propose to modify or revoke it or issue a final rule that modifies or revokes the tolerances. Under FFRA, the analysis is a bit different. So EPA issues pesticide registrations, which are akin to a license, to... for pesticides that meet the registration standard, which is that it does not cause unreasonable adverse effects on human health or the environment. In conducting this analysis, EPA weighs, on one hand, the benefits of the use of the pesticide against the potential risks to human health and the environment. As your honor mentioned, EPA is currently working on registration review for around 800 active ingredients. And in that process, EPA assesses whether those registrations still meet the registration standard. EPA's process for registration review is to issue human health and ecological risk assessments, then a proposed interim decision, followed by an interim decision, then a proposed final decision, and finally, a final decision. In our timetable in the brief, where EPA states that it is going to respond to certain of the FFRA claims in conjunction with registration review, EPA plans to respond to those with the interim decisions. In other words... By 2026? Not necessarily. EPA... 2026 would be that... So let's take, for example, the one you mentioned, that you think you will say it causes human harm, or then you would issue a proposed rule to withdraw the registration, and that would kick in some period of time for an interim rule? That would take place after EPA responded to the petition. So we, I think, included FFRA response dates for seven of the pesticides in 2026. For the remaining six pesticides, EPA would respond with the interim decisions, and EPA anticipates that that would be about four to five years. However, for three of those pesticides, EPA has already taken interim action to mitigate risks to workers. You have taken... You have taken action. And what does that entail? Meaning you've issued interim rules that regulate how it can be, and when it can be used, or things like that? EPA has worked with the registrants to cancel some uses, and then put in place new label requirements for how the pesticide is applied to protect workers. I'm just trying to figure out how we get here. Even if we can't issue mandamus relief right now, because we haven't hit the outer thresholds that some of our case law suggests, I'm not hearing a lot from EPA to say that you're going to have a resolution within a time frame that would seem, or we would expect. So what are we supposed to do with that? I mean, do we just deny mandamus and say, come back in two years? Or do we hold on to this, and the problem is holding on to it? I mean, we get into a very thorny issue of how much do we oversee this process. But when I hear EPA saying, look, we've got at least one that we think causes human health, possibly more, and we're not going to have a final agency action for four or five years, which is what I understand. Now, that's buttressed by this, but we've done some mitigation in there. I'm trying to figure out how to glean some comfort from what EPA is saying here. EPA is planning to respond to all but one of the FFDCA claims in 2026. Right, but respond doesn't mean, you just told us, does not mean actually changing necessarily on the ground the use of it in 2026. The EPA has the flexibility under the statute to issue a final rule or a proposed rule. I understand that. But I'm just trying to figure out the time. What I'm hearing, and this is what I'm hearing, is nothing is guaranteed to change on the ground for four or five years. From now, which is effectively almost 10 years, potentially, from when the petition was filed. That's correct. We think... Help me understand how that fits within our PANA paradigm. So I think the first Henry PANA case denied mandamus after... Four years. After four or six years. Four years. Okay, four years was the first one. And that was for just a single organophosphate. Okay, so that gets into a separate issue, which is... And I was asking these questions. There's 12 of them at issue here. Does that change it? So do you get 40 years? I mean, what are we supposed to do here? I don't think that we get 40 years. But the reality is that the science at issue for these pesticides is incredibly complex. And EPA has been working on it. So do we pick... Can we pick the one that you've said you think is going to cause human risk and say, you got six years. You got to get this done by six years. You've already had four years. We expect that to be off the market or steps to be taken or something to be done by 2026 or early 2027. We don't think that PANTNA has met the threshold under the track factors for granting mandamus. And in order to set deadlines for EPA to respond and take any subsequent regulatory action, the court would have to grant mandamus. And we don't think that's appropriate here. First, as your honor mentioned, only four years have passed here. The administrative petition sought action on 15 different pesticides under two separate statutes. EPA has already taken final action on two of those. And it has a plan for the rest. So if we were to agree with you and say they haven't met it yet, they haven't met the threshold and the track factors. But maybe they would in a couple years or something. That could change things at least as to one or more of these 12. What do we as a panel do with that? I mean, I guess in theory, I think Judge Nelson may have alluded to this. In theory, we could just deny mandamus, you know, meet the track factors, come back. The other would be to deny mandamus but ask for, I think the D.C. Circuit did something like that, asked for updates every once in a while. That sounds like we end up overseeing all the school districts in the western United States or something like that with 12 of these things. In 48 years, if you take four, yeah, it just sounds like maybe. We'll be senior judges. Yeah, I'll be dead by the time. So I don't like, what do you want us to do? I suppose the answer is probably just deny mandamus and walk away. Or deny mandamus and ask for the D.C. Circuit's approach. What do you want us to do? We think the court should deny mandamus and if several years from now, petitioners are not satisfied with the rate of progress. Why does it have to be several years? If we deny mandamus, they could come back tomorrow and file and get a different. And in theory, a different panel could say, we agree. Maybe they decided it doesn't work to do 12. Maybe it's the hot potato case for the court. Well, maybe they decided not to do the 12. Because that is a factor here. You can hear us struggling with that. It's like, what do we do with all 12 of these? So they decide it's better to go after the lower hanging fruit. And they come back and that panel, six months from now, it takes six months probably to get everything briefed up. But that panel actually grants mandamus. So what should we do? I think the court should deny mandamus. And if petitioners want to file a new mandamus petition, that's something they could do. Under your current timeline, what's the earliest you'll have final agency action on any particular chemical? So for the FFDCA and FFRA, for six of them, EPA plans to respond in 2026. But there isn't a precise time frame. Respondent, my question was, when will you have a final agency decision that can be challenged? So under the FFDCA, a denial, a certain time frame. A final agency decision that could be challenged. And some of these would be denials. EPA's current thinking is that they would be. And the time frame for those decisions is? I believe in 2026. Okay, so they may have final agency action on six with final no findings that they could challenge by then. They may. So I can't predict what the outcome of EPA's analyses will be for the ones in 2026. But under the statute, EPA has to deny, propose a rule, or issue a final rule. Those are the only three choices. But you seem to suggest that at least two of them, dimethylate and malathion. Two of them, you're suggesting right now, the current thinking is just deny. Correct. And that would happen in 2026?  And maybe more. But on the one where, I think you said it was, as a fate where you think that there is harm, you'll respond by 26. But what form would that take? Some interim thing that will then be another few years? It would be in the interim. It would be with an interim decision. The process under FFRA for modifying or canceling registrations can be a little bit complex. So one... But this also involves human health and safety. And if the tentative view is that something is harmful, that needs to go to the front of the line and be moved more quickly. I can understand that if the tentative thinking of something is not, that it can be moved back. And so I think one of their points is that where the thinking is that something is harmful, there needs to be more expedition. EPA certainly takes the potential risks to human health and safety very seriously. But that there are potential risks does not abrogate EPA's responsibility to get the analysis right.  To add to what I think Judge Collins is getting at, there does seem to me that in some sense, there's a perverse relationship or a counter relationship to if the EPA thinks, hey, this particular one, no harm at all. Maybe they get a decision and they can actually appeal that next year in 2026. But in some sense, it's sounding to me like if it's one that the EPA is really struggling with and thinks may be problematic and trying, then that maybe takes, that's the one that's at the back of the line and we don't get a final decision. That's not one of the six, maybe. And so those particular ones, if you don't get mandamus, they get no review for a long time. There's, you see what I'm saying? It seems like that's the opposite of what you would want in a better world. I certainly understand the concern. It might be helpful to describe some of the process that takes place when EPA does identify human health risks. Can I ask you one quick question before you do that? The three different outcomes you said that the statute allows for, the six that you're hoping to have, are all three of those subject to judicial review? Or as you said, one of them would be a no, the no action would be subject to, a denial would be subject to judicial review. Presumably a final agency action saying, a final rule would be subject to judicial review. The third one was an interim rule. Would that be subject to judicial review? The interim decision is under FFRA. So I think it's a little bit difficult to keep these two statutes separate. But under FFRA, EPA plans to respond in the interim decision phase. So for the FFRA claims, EPA will respond. And would those be subject to judicial review? Yes. So an interim decision is a final agency action and can be subject to judicial review. So those six would have, would in theory be available for judicial review next year in 2006, or 26, if you meet your hopeful deadline. For the other six or so, whatever the number is, what are the years for those, 28? So for seven, EPA's plan is to respond in 2026 for the FFRA claims. For the remaining six FFRA claims, EPA anticipates responding in about four to five years with the interim decision. But again, for three of those- Are those ones, the reason they're taking longer? What is the reason they're taking longer? Is it because they're harder? It's, they're just in different phases in terms of the scientific analyses here. I guess what I'm trying to ask about is sort of what we were getting at before. It would seem in a perfect world, you would want to have the ones that seem to have the greatest risk of possible human health to be at the front of the line. So you're getting, but it also, I don't have confidence. It seems to me that it might be the opposite because those are the harder ones to deny. They're just taking a lot longer for the agency to work on them. That's not my understanding from EPA. It's that it's working on all of these and some of them are just in different phases in interpreting the new data. There's one pesticide, FOSMET, for which EPA has issued a call-in order for an inhalation study that it thinks would be relevant to its analyses. So FOSMET is a little bit further behind because of that. But again, for the FIFRA decisions with later, of the FIFRA claims with later response dates, EPA has already taken action on half to mitigate risks that it's identified for workers. These are the label changes and such? Yes, yes. And the one thing I think is helpful to understand is how complicated the science that is at issue. I don't think we, I mean, we get it. This is complicated and there's a lot at play here. But we're not hearing a lot of satisfaction that EPA has a game plan. I mean, that's great that you're doing an inhalation study, but I assume that's going to take a year to complete the study, a year to analyze the results. In the meantime, like if that's causing harm, what are we supposed to be doing? And that's, I think, what we're struggling with, is whether we enter into this now or whether we pass the buck to a future panel in a year or two, it seems like this is headed towards a mandamus petition that's probably going to have some pretty compelling basis soon. And so what can EPA do to remedy that? Well, I do think EPA has provided a reasonable plan. The majority of the health concerns that petitioners Because of the mitigation factors, you're saying. Well, the majority of the human health concerns that they've identified are related to food tolerances. And with just one exception, EPA is planning to respond in 2026. EPA is refining these analyses and has an obligation under the law to get them right. They have an obligation to consider this new data that's before it that will help the agency to more precisely evaluate risk and to resolve. So with respect, I'm looking at your timeline and you have, you know, five chemicals that you say will not have both the FDCA and FIFRA claims done by 26. One of those they've said they may not have standing, which is terbufos, but the other is benzalide, diazinon, ethopropanthorate. What's the current thinking within the EPA as to the risk of those four chemicals? EPA hasn't issued any proposed interim decision on those. So it's still working on analyzing any human health risks there, but it anticipates completing its analyses in 2026. Again, for all but one of the FFDCA claims and then for seven of the FFRA claims. I thought these four chemicals, I just said, those are on the four to five year track. Okay, I'm sorry. I apologize, Your Honor. I don't have those in front of me. So EPA has identified for the four to five year track, EPA for three identified human health risks and took action on, but it doesn't have current thinking. And which three are identified as having human health risks? So it took, I believe, on FOSMET and two others. I would be happy to follow up with the court, but I don't recall off the top of my head the other two. Okay, I'm circling back to my question about whether or not the four that are on the slow track are, you know, whether that's justified in light of your current thinking about the health risks and the showing that they've made on that. Well, we disagree that they've made a showing on that. EPA's initial human health risk assessments were just that, their initial. And there were a lot of uncertainties in them and EPA retained the default 10X safety and uncertainty factors. But if you come in at year four and then say, well, it's going to take us another four to five years and so that's eight to nine years, why should we accept that as reasonable? Well, there were 15 pesticides in this administrative petition and they each require individual scientific analyses. And in that- Sometimes you have to work, have teams working on things in parallel at the same time. The world's a complicated place. You don't get to do them one at a time. Well, the reason why EPA is working on separate scientific analyses for each pesticide is that evidence suggests that they may have different potential to cause impacts to human health. So in order to make sure that these analyses are correct, EPA is looking at the pesticides individually. And in doing that, it's looking at epidemiological data. It's looking at- But none of that, that's all the same thing that was at issue in PANA too. I mean, the difference here is you do have 12 or 13 that are at issue. I think the fact that EPA has done a couple of these is good news for it. But to Judge Collins' point, I mean, you can't, you may get some benefit by having 12 of these pending, but it can't be some exponent. You don't get to multiply the time periods by PANA by some exponential number. And so we're still bound by PANA to some degree. And I'm just not hearing anything that is fitting this within PANA timelines. So I just, I feel like whether we grant the mandamus petition now or whether it gets granted in a year from now, I don't see anything that is heading off a train wreck coming. And then what happens? The court orders you to act on 12 of these in 90 days. And is EPA even going to be able to do it? I don't think EPA would be able to- I tend to agree with that. That's true. And so how do we take into account with that? We want to be lenient. We don't want to overstep our bounds, but you're not really giving us a lot of off ramps here. Well, so one of the, I think the assumptions in petitioner's argument here is that all of these pesticides do cause impacts to human health. I think what Judge Collins was getting at, what we've all been trying to get at is go ahead and focus on them. Everybody agrees there's some number. EPA says it's one. I'm sure the petitioners say it's 12. So I mean, there's going to be some debate, but whether it's one or six, there's some number of these that are going to have some effect on human health. And you can't just study that for six years and just keep saying, well, we need more evidence. We need more evidence. We need more evidence. At some point, you got to pull the trigger and you're not giving us a plan where you're going to do that. This is not a case where EPA is going to study, study until court tells it to stop. EPA has before it specific data that it thinks is reliable and that it's obligated to consider. But you had data 10 years ago. Not this data. Yeah, I understand that. But 10 years from now, you're going to have not this data as well. And so you had some data 10 years ago and now you're just saying, well, now we need new data. We need a new inhalation study. Great, I believe you. But what does that mean about the current data right now? And so anyway, I, yeah. If I may. So the inhalation study is just for a single organophosphate. EPA has been working with international organizations to develop what are called new approach methodologies. And these are studies of rat and human cells in Petri dishes. And they're very complex, but they test the potential for these organophosphates to cause adverse neurodevelopmental effects. There are other data from the same line of studies that test the difference between rat neurons and human neurons and how they respond. The FFTCA requires EPA to take into account the reliability of the data before it. And it has this chemical specific data, but it takes time for EPA to revise these analyses to incorporate this new data. And there are. So if I'm, we've taken a way over, but I want to see if I can summarize here before you sit down and maybe hear the response. So if 12, 12, it sounds like six of the 12, you will be taking some action. EPA will take some action in the next year. So that seemed like us ordering mandamus on that seems unnecessary, assuming that EPA does what they say that they're going to do. That leaves six. Of those six, you think some number of those are possibly problematic. The evidence, the preliminary evidence maybe shows that others are not. I'm just trying to think if we deny mandamus on all of them, in theory, what the other side would come back with if they came back in a year could be a very trimmed down and more focused on the particular ones we've been speculating about, because we're trying to narrow down our thinking, but it's hard because there's 12. Is that, and I guess I'm curious from both sides, but if there's another mandamus petition in a year or two years, it could be reduced down to a few of these where maybe there's some evidence at that point that says that, no, there really is. These are the ones that actually, we've got some evidence that are causing a problem. And you also aren't going to do anything for another four or five years, you being EPA. Well, I think, so in understanding the prolonged, or the longer timeframe for certain of the FIFRA response dates, it's, I think it's important to remember what goes into making these. Just make sure, so I'll, I don't want to repeat. My point is just that I'm trying to figure out if it could be narrowed down to where, and I'm not asking you to concede. Yes, those are the ones that would be problematic and those are the ones that would be appropriate for mandamus action. I'm just, I'm trying to figure out, it seems like a year from now, it could be, it'd be narrowed down by probably six would be dropped, but maybe even more than six if to be focused on just the ones that are the ones that we've been sort of talking about in theory, the ones where we think that there may be a risk of human health. And at that point, they come and they say, these ones here, EPA wants to study, study, study this for four more years. There's a risk of human health. They need to stop. I think in one, two years, whatever, there might be more information about these pesticides with later FIFRA response dates. EPA might be further along in its analysis there. I'm trying to figure out as if in one, so I think that's probably true, hopefully, but in one to two years, will the pile of these be whittled down that would be in theory subject to a mandamus consideration because the other ones would be often in a challenge to the agency's final decision for one of the two statutes. I believe so. So EPA plans to respond to all but one of the FFDCA claims next year and to seven of the FIFRA claims next year. So that certainly would whittle down the number of pesticides at issue if petitioners were to bring a new mandamus action after that. Returning back to the other question I have, which was if we were to say, okay, so that's the lay of the land. This hasn't fallen the egregious six years quite yet, but it's getting close. What do we do? Do we just deny mandamus and say that? And then, or do we ask for reports every six months or a year? I think it would be more appropriate here to deny mandamus simply because petitioners haven't met the track factors. Well, but that was also true in some of the D.C. Circuit cases. They hadn't met them, but they asked for reports every six months. Because the reason they hadn't met them was large part that the time wasn't quite there yet, but you could see it. And if you could see the time factor changing in the near future. We certainly would file status reports if ordered to by this court. Okay. If there are no further questions. Thank you for answering our questions. As you can tell, we're struggling with a complicated case. So thank you. Thank you. All right. We'll hear a rebuttal. So you've heard everything that would just take care of this whole case, right? They gave you all the right answers. Unfortunately, not because of the human health risks that are at stake here. Can I just ask a clarifying question? Just so that I had a, you had mentioned that there was the one chemical with cotton that there may be an issue of standing. And I want to make sure, because there were two names that are very similar, tribufos and terbufos. Which one were you referring to? You know, I have been hopelessly confused with this. I believe tribufos, tri, tri is the one used on cotton. I misspoke earlier. Yeah, that's the one used on cotton. Okay, I misspoke earlier in my exchange. I know, I tend to use like, you know, acronyms for them, you know, to try to avoid confusion. But I guess, I mean, you can hear one of the concerns we have is, you know, in resolving this, should we distinguish between the chemicals? Because if they say they're going to get through seven of them, and they'll have decisions under both statutes by 2026, which is closer within the sort of six-year outer limit we've suggested in the case law, why shouldn't we deny as to those and then focus on what is left? Well, so we have actually offered EPA some prioritization that would be health-based and the ones that are of concern to the petitioners. Unfortunately, some of them in the first bucket were not the ones that we thought were most important to address first. I think EPA has said its prioritization is not based on the magnitude or severity of the risk. It's basically just a... Can I ask a question about that? Are some of them, are some of the ones that you think pose a greater health risk, are some of them in the first bucket? Some are, yes. Some are and some aren't. So it just seems to be random from that perspective. Like it's not... Well, because it occurred to me that maybe that the ones that pose the greatest health risks are the ones I think they need to look at the most. And those would all be in the back bucket, which would be, as I said earlier, a little bit of a perverse situation. But that's not exactly it. It just seems kind of randomly allocated. It's true for some. And I'd like to address the court's concern about there being 12 here. There are some that we would not prioritize. Happy to share that. I think that would get us down to about nine. And... Which ones would you say not to prioritize? Chlorethoxifos. And which bucket is that? That's in the first bucket. Tribufos, which is in the first. That's the one on cotton. And Turbifos, it's primarily on corn. And our concern has not been the corn and the cotton so much. And the chlorethoxifos is corn, too, and not that widely used. In the EPA's prioritization, in the second group is a pesticide called Benzalide, widely used, has incredibly severe risk to workers. And the EPA has found that the levels in drinking water are 10,000 times or 10,000% of the level it deems safe. It has not updated that risk assessment. And this is in the nonspecific category, the second one. And what about the other three in the other category? Diazinon, Ethoprop, and 4-8? Those are priorities for us. 4-8 is the only one that didn't have a risk assessment in 2015 to 2020. It had one back in 1999 that found worker risks that were not mitigated. But we have less information. Hopefully, we'll have that in 2026 when it updates that or provides a risk assessment in the first instance. And then Fosmat's in the last category. EPA has required the company to do an inhalation study, but that study is due this month. So there will be no longer any outstanding data. All the data's collected. I mean, that only gets you halfway there. Then you've got to study the data. Then you've got to, I mean, I guess we have to take them at their word at this point that they're still going to have whatever they need done by next year on that one, right? Well, that one has just with, in conjunction with registration review. And I'd like to address that. And EPA has clarified now that that category that does not have 2026 in the deadline means four to five years. And that is, that's past the statute. No, I understand. What do you want us to do? I mean, we could, it seems like if we just denied the petition, which I know you don't want, but you could come back with a much more, yeah, streamlined, narrow, targeted petition a year or two years from now, whatever you want to do. Or we could hold onto this. I guess you could streamline within us holding onto it. I mean, which is your preferred avenue? We would like the court to hold EPA to the 2026 deadline it has provided to the extent it has. To give EPA a deadline for, this is making its updates to its risk assessments for the others in some date that is not unspecified in four to five years. And, and this is the most important thing that we want, is for the court to order EPA to take action to protect people from the risks that it finds unsafe. Can I ask you about that? Because they claim that they have by doing some of this mitigation measures. I take it you're, I want to hear it, but I take it your response is not good enough. But you're aware that they've taken some mitigation actions. Yeah, it's very small. So for four of the pesticides, EPA did update the worker risk assessments and it asked the companies to voluntarily agree to mitigate the risks that were 10 times more severe than what EPA had said was at safe level in the risk assessments. And it obtained label changes and mitigation for some of those, not all of those risks. And for some of the risk to communities when the pesticide drifts from the fields to schools and homes and play fields. Some, but not all. So yes, it obtained some and we were grateful for that. It was much needed mitigation. But it obtained, it was only for four and only some of those risks. And it did not address the risks in food for phosnet where the most extreme risk of unsafe exposures is for children and baby banana food. That will go unmitigated for who knows when. That's in the unspecified category. And for some of the others, bansalite, which was not part of that. Ethoprop, which was the risks in drinking water are off the charts. So that the drinking water children would consume or pregnant women could lead to the harms that EPA acknowledges are associated with these pesticides. And I'd like to address the point about, well, there are 12. EPA is addressing them one by one. We would probably pick a different priority, but we're going with that. And then it will have its individual findings. We would ask for further relief or order from this court only for the ones that EPA finds unsafe. So for asaphate, EPA has done all that work. It updated the risk assessment in 2023. So you said a lot of different things here, but what I'm trying to start with is if we are to conclude that we're not quite at the timeframe yet to where this is egregious and under our precedent, then if we, you know, I think you said you want us to hold their feet to the fire on the 2026 ones they've said to have done it. But how do we do that? We say, well, we're not, no mandamus because, but if you don't get it done by 2026, I mean, it seems that the way to do that would be just to deny mandamus and say, hey, if they don't follow through with what they've said with regard to that segment, then come back and file a new mandamus petition. And if that's the correct result for those ones, then it seems odd for me to say, but for these other ones, EPA has given us a lot further out. We haven't quite got to the deadline yet, but because they aren't able to tell us they'll have it done in a year, we're going to grant mandamus. I'm just trying to figure out why we wouldn't deny mandamus. All these arguments that you're making now, you could come back in a year or two and have a lot more concrete. You'd be able to tell the court, hey, they said 2026, they didn't meet 2026 for the ones that are in that bucket. And for the other ones, you'd be able to make these arguments and say, they've blown the 2026 deadline that Congress put on them. I mean, not to interrupt, but that does seem consistent with what PANA did. I mean, PANA denied, and then a new petition was filed and then it was granted, right? Or did they hold it? Well, yeah, the court denied because there were no findings that the pesticides were unsafe. But once those findings existed, the court gave EPA 90 days to propose a tolerance revocation rule for the unsafe uses. If the court denies the petition and says we can come back, basically it is allowing EPA to leave these exposures in place so that people will be poisoned on contact and there'll be more instances of children with autism and all that could be prevented. That's true even if we hold it and ask for six month updates. That is true. We think that EPA has to take action in a defined period of time. I understand, but what we're struggling with is action on which ones because I think even you are agreeing. I don't want to say you're conceding that mandamus isn't warranted on DOL 12, but you think that, let's put it this way, the mandamus petition is stronger on some of these than other ones. And I think I'm not sure we know the answer to that. Well, there is one answer that is in our papers is the three where EPA did update its risk assessments and safety findings, asafate, dimethylate, and malathion. It proposed mitigation and while some of that mitigation is for ecological reasons, it would get rid of uses that EPA previously found were unsafe for children. Those three, asafate, and what were the other two? Dimethylate and malathion. And asafate in particular, that is the one that the updated risk assessment found drinking water contamination. And the mitigation has not yet been implemented on those?  Nothing. And asafate, EPA said pretty much an entire ban. There was one minor use that could continue because of drinking water contamination that would be unsafe for children and harm to workers. EPA has done nothing. That would be the first priority, that it should finally act on that. And its proposal was January 2024. And then for dimethylate, EPA did propose to phase out a lot of uses where there's a lot of worker exposure and EPA had previously found the uses unsafe. That would benefit. But all three of these are in the first tranche. They all are in the first tranche where EPA says it will finalize its decision, but... By 2026. It says so. But it won't take the action. So for malathion, it would presumably deny the FFDCA petition because it didn't find unsafe food exposures in the revision. For asafate, it did find those exposures and it would do nothing. For yours, that would require us to assume they're going to act, but they're going to act to deny the petition or effectively deny the petition. That's asking a lot of us to just assume that when they haven't made a decision and said they will be making the decision relatively soon in the next year, I guess. Well, the thing that's unusual about this delay case is EPA has not offered a timeline to take action. Final agency action, you're saying? Yeah, they have not offered... And most of the unreasonable delay cases... But if their answer for some of these is going to be in disagreement with you all, I suppose, that we don't need to take an action because we're fine where we are, then wouldn't we be in a lot better position if we concretely had that? Right now, we just have to assume that that's what they're going to do. Well, we're only asking for a timeline when EPA finds the use is unsafe. And that statute requires them to revoke the tolerances. I don't recall an unreasonable delay case where the agency offered the court nothing. There are some situations where the court asks the agency, okay, give us the timeline. Or tell us if there's something more compelling from a human health perspective that takes priority. EPA's offered nothing to the court along those lines. No. For those reasons, we ask the court to grant our petition and to give EPA a deadline to take action to protect people from the risks it finds unsafe. Okay. Thank you. Thank you to both counsel for your work on this case. You've given the court a lot to think about. The case is now submitted. And that concludes our arguments for the day. All rise.
judges: NELSON, COLLINS, VANDYKE